IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KELVIN CANALES** | **CRIMINAL ACTION**<br><br>**NO. 21-226-KSM** |

**MEMORANDUM**

**MARSTON, J.**                                                                                           November 20, 2023

Defendant Kelvin Canales was indicted by a grand jury on a single count of violating 18 U.S.C. §§ 922(g)(1) and 924(e), which forbids any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] . . . any firearm or ammunition." (Doc. No. 1.) Before the Court is Canales's motion to dismiss the indictment in which he argues that the Third Circuit's recent *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) renders § 922(g)(1) unconstitutional both on its face and as applied to him. (Doc. No. 47.) Canales's arguments are without merit, and the Court denies the motion.

I.      **Factual Background**

Canales is certainly no stranger to the criminal justice system. Over the past ten years, he has been convicted of one felony in federal court and two felonies and one first degree misdemeanor in Pennsylvania state court. (Doc. No. 48 at 2–3.) Nearly all of these charges relate to drug trafficking. (*Id.*)

First, Defendant was arrested on March 14, 2013 and pled guilty on November 6, 2013 to possession with the intent to manufacture or deliver a controlled substance (heroin/cocaine), in violation of 35 Pa. Cons. Stat. § 780-113(a)(30) and possessing instruments of a crime, in

1

violation of 18 Pa. Cons. Stat. § 907(a). (*Id.* at 2.) For these offenses, Canales was sentenced to two and a half to five years in prison and four years of probation. (*Id.*)

That same day, Defendant pled guilty to an additional charge of possession with the intent to manufacture or deliver a controlled substance (cocaine) relating to a separate arrest that took place on August 20, 2013. (*Id.* at 2–3.) For this conviction, Defendant was sentenced to four years' probation. (*Id.* at 3.)

A few years later, on August 29, 2017, in the Middle District of Pennsylvania, Canales pled guilty to distribution and possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). (*Id.* at 2.) For this offense, Canales was sentenced to thirteen months' imprisonment with four years of supervised release. (*Id.*)

That brings us to the indictment at issue. According to the Government, in the early morning of April 21, 2021, while still under supervised release for his 2017 conviction, Canales was involved in a robbery in north Philadelphia. (*Id.*) The Government alleges that during this robbery, Canales shot his victim. (*Id.*) An hour later, Canales crashed his car into a tree. (*Id.* at 1.) Before the police arrived at the scene of the accident, Canales walked into a nearby alley and threw a firearm into the trashcan. (*Id.*) The officers who responded to the accident later recovered the firearm. (*Id.*)

On June 3, 2021, Canales was indicted by a federal grand jury. (Doc. No. 1.) The indictment read in relevant part that, despite having "been convicted in a court of the United States District Court for the Middle District of Pennsylvania and a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year," Canales "knowingly possessed a firearm, that is, a Taurus, 9mm semi-automatic pistol . . . loaded with six

live rounds of 9mm ammunition" in violation of 18 U.S.C. § 922(g)(1). (*Id.*) Canales also faces separate charges in state court for his involvement in the robbery and shooting.

## II. Applicable Law: The *Bruen* and *Range* Decisions

Canales moves to dismiss his indictment, arguing that § 922(g)(1) violates his Second Amendment right to bear arms. The Second Amendment provides, in relevant part, that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This right, however, is "not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). Indeed, as the Supreme Court outlined in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Instead, on multiple occasions, the Supreme Court has outlined that the Second Amendment allows for a "variety" of firearm regulations, including the "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 636; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' . . . We repeat those assurances here.") (citation omitted).

The Supreme Court revisited the Second Amendment this past year in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court held unconstitutional a New York statute requiring individuals to show that "proper cause" existed before they would be provided an unrestricted license to carry a firearm outside of their home. *Id.* at 2123, 2156. In so deciding, the Court clarified the standard by which courts are to analyze whether a firearm regulation is consistent with the Second Amendment. Prior to *Bruen*, the Courts of Appeals "coalesced" around a "two-step" test that combined history with means-end

scrutiny. *Id.* at 2125. Under this test, a firearms regulation was constitutional so long as the government showed either 1) that the conduct regulated was beyond the scope of the Second Amendment right as originally understood or 2) passed either intermediate or strict scrutiny, with the appropriate standard determined by whether the regulation burdened a "core" Second Amendment right. *Id.* at 2126–27. The Supreme Court held that this approach was "one step too many." *Id.* at 2127. Rejecting the means-end approach, the Court held that for a firearm regulation to be constitutional, the "government must affirmatively prove" that it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* In other words, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

The Court acknowledged that while in some situations such an analysis "will be fairly straightforward," such as where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," *id.*, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," *id.* at 2132. In such situations, courts are instructed to "reason[] by analogy" and find that a "historical regulation is a proper analogue for a distinctly modern firearm regulation" only where "the two regulations are 'relevantly similar.'" *Id.* To determine whether regulations are sufficiently similar under the Second Amendment, the Court pointed to two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put another way, the "'central' considerations" when conducting this analogical reasoning is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The Court clarified that "analogical reasoning requires only that the government identify a well-established and representative

4

historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphasis in original).

Given that the challenge in *Bruen* did not implicate § 922(g)(1), the majority opinion had no occasion to address the constitutionality of the statute. Nevertheless, six Justices (Roberts, Alito, Kavanaugh, Breyer, Sotomayor, and Kagan), through concurring and dissenting opinions, signaled their understanding that the majority opinion in *Bruen* did not call into question the constitutionality of the § 922(g)(1). *See id.* at 2157 (Alito, J., concurring) (noting that the decision does not "disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the carrying of guns"); *see also id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (emphasizing that "the Second Amendment allows a 'variety' of gun regulations," and that *Bruen* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons" (citation omitted)); *id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor, and Kagan, JJ.) (explaining that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" that addressed presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon).

Shortly after *Bruen*, the Third Circuit issued its *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), which Canales now seeks to invoke. *Range* was a civil action brought by Bryan Range who sought a declaration that 18 U.S.C. § 922(g)(1) violated the Second Amendment only as applied to him, and an injunction prohibiting the law's enforcement against him. *Id.* at 98–99. Twenty-eight years prior, Range had pled guilty to one count of making a false statement to obtain food stamps, in violation of 62 Pa. Cons. Stat. § 481(a). *Id.* at

98.  In short, Range misrepresented how much money he earned when filling out a food stamp application at a time where he was supporting his wife and three children on $300 per week of income.  *Id.*  This conviction, although classified as a misdemeanor, was punishable by up to five years' imprisonment and thus Range was precluded from possessing a firearm under § 922(g)(1).  *Id.*  Range, however, desired a rifle and potentially a shotgun for hunting and self-defense.  *Id.* at 99.

The district court granted summary judgment to the Government, "faithfully applying" the then-controlling two-step analysis.  *Id.*  Range appealed and while his appeal was pending, the Supreme Court's opinion in *Bruen* was issued.  *Id.*  The Third Circuit panel permitted briefing on *Bruen*'s impact, but nevertheless affirmed the dismissal of Range's complaint, finding that the Government had "met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction 'places him outside the class of people traditionally entitled to Second Amendment rights.'"  *Id.* (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022)).  The Third Circuit granted Range's petition for rehearing *en banc*.  *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023).

The Third Circuit's *en banc* opinion reversed the panel, holding that § 922(g)(1) was unconstitutional as applied to Range.  *Range*, 69 F.4th at 98.  The court interpreted *Bruen*'s historical framework as requiring two steps:

> After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct.  If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Id.* at 101 (quoting *Bruen*, 142 S. Ct. at 2127) (citations omitted).  The court answered the first question in the affirmative, rejecting the Government's argument that the Second Amendment

6

only covers "law-abiding, responsible citizens" and instead holding that Range, like all Americans, was one of "the people" guaranteed Second Amendment rights. *Id.* at 101–03. The Court found the question of whether the Second Amendment covered Range's conduct to be an "easy question," holding that his request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right. *Id.* at 103.

Turning to the second step of the *Bruen* analysis, the Court held that the Government had failed to meet its burden of demonstrating that the restriction set forth in § 922(g)(1), as applied to Range, was "consistent with the Nation's historical tradition of firearm regulation." *Id.* The Court found the Government's reliance on language in *Heller* describing § 922(g)(1)'s prohibition as "longstanding" insufficient and held that the Government's invoked historical analogues were inapt. *Id.* at 103–06.

Since the Government failed to carry its burden under the newly established *Bruen* framework, the court reversed the panel's prior decision. *Id.* at 106. But the court stressed that its holding was "a narrow one." *Id.* The majority emphasized that the Government had failed to show that "our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms" and thus § 922(g)(1) was unconstitutional *as applied* to Range. *Id.* (emphasis added). Indeed, as made clear by Judge Ambro's concurrence, the majority's opinion did not "spell doom for § 922(g)(1)" or limit Congress's ability to disarm those "who pose a threat to the orderly functioning of society." *Id.* at 109, 113 (Ambro, J., concurring); *see also United States v. Blackshear*, No. CR 23-159, 2023 WL 5985284, at *2 (E.D. Pa. Sept. 14, 2023) (noting that "*Range*'s holding was narrow and limited to the facts of that case, particularly the nature of Bryan Range's previous conviction"). Instead, § 922(g)(1) remains "presumptively lawful." *Range*, 69 F.4th at 109–10 (Ambro, J., concurring) (quoting *Bruen*, 142 S. Ct. at 2162).

7

### III.   Canales's Arguments Are Without Merit

Canales argues that, applying *Range*, his indictment should be dismissed because § 922(g)(1) violates the Second Amendment both as applied to him and on its face. (Doc. No. 47 at 6.)  The Court addresses each in turn and finds that neither argument has merit.

#### A. Section 922(g)(1) is Constitutional as Applied to Canales, A Dangerous Felon.

First, Canales argues that § 922(g)(1) is unconstitutional as applied to him because his possession of a firearm was covered by the Second Amendment and the Government is unable to meet its burden of showing that the application of § 922(g)(1) to him is consistent with the Nation's historical tradition of firearm regulation.[1]  (Doc. No. 47 at 8–10, 12.)  Applying the two-step *Bruen* analysis, the Court must first "decide whether the text of the Second Amendment applies to [Defendant] and his proposed conduct."  *Range*, 69 F.4th at 101.  If so, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.*

At the first step, the Government correctly concedes that under *Range*, Canales is among "the people" covered by the Second Amendment despite his prior felony convictions. (Doc. No. 48 at 7); *see Range*, 69 F.4th at 101–03 (holding that all citizens fall within the purview of the Second Amendment, not just those who are "law-abiding").  However, the Government argues that Canales's *conduct* is not covered by the Second Amendment.  (Doc. No. 48 at 7–11.)  In *Range*, the Third Circuit gave this portion of the analysis short shrift, deeming it an "easy question" and finding that Range's request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right.  *Range*, 69 F.4th at 103.  Here, the Government

---

[1] While it appears that Defendant's brief is primarily geared toward his facial challenge to § 922(g)(1), because a facial challenge requires that "no set of circumstances exist[] under which the Act would be valid," *United States v. Ladson*, No. CR 23-161-1, 2023 WL 6810095, at *2 (E.D. Pa. Oct. 16, 2023), the Court finds it appropriate to address his as-applied challenge in the first instance.

argues that two facts complicate the analysis: 1) Unlike in *Range*, Canales has not shown that he possessed a firearm for a lawful purpose; and 2) Canales was on probation at the time that he was found possessing a firearm and thus had already forfeited his Second Amendment right. (Doc. No. 48 at 7–11.) These arguments have some force. *See United States v. Terry*, No. 2:20-CR-43, 2023 WL 6049551, at *4 (W.D. Pa. Sept. 14, 2023) (finding that defendants failed the first step of the *Bruen* test because they were on probation and thus their conduct was not governed by the Second Amendment); *United States v. Jenkins*, No. CR 23-088, 2023 WL 6534200, at *6 (E.D. Pa. Oct. 6, 2023) ("[W]here a Section 922(g)(1) defendant cannot prove by a preponderance of the evidence that he was carrying a firearm for the purpose of self-defense—or other conduct expressly covered by the Second Amendment, such as hunting—the right to bear arms does not protect the defendant, and the indictment survives an as-applied challenge."). *But see United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *9 (M.D. Pa. Sept. 1, 2023), appeal docketed, No. 23-2604 (3d Cir. Sep. 6, 2023) (rejecting argument that the Second Amendment didn't cover defendant where he possessed gun while on probation/parole). But because the Court finds below that the Government has met its burden at the second step, it need not address these issues and will assume that the Second Amendment covers Canales's conduct without so deciding.[2]

      Turning to the second step of the *Bruen* analysis, the Court must determine whether the Government has shown that § 922(g)(1) as applied to Canales "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. As

---

[2] The Government also argues that *Range* was wrongly decided. (Doc. No. 48 at 3–4.) Because the Court is bound by Third Circuit precedent and the Government makes clear that it includes this argument solely for preservation purposes, the Court will not address it. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

previously discussed, the Supreme Court in *Bruen* provided that this historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original). In identifying a historical analogue, the Court in *Bruen* warned that "not all history is created equal." *Id.* at 2136. Because the Second Amendment codified a "pre-existing right," "English history dating from the late 1600s, along with American colonial views leading up to the founding" are relevant to identifying the scope of the right. *Range*, 69 F.4th at 106 (Krause, J., dissenting) (quoting *Bruen*, 142 S. Ct. at 2127).

As an initial matter, the Court rejects Canales's assertion that because he makes a facial challenge, the Government must establish "a historical analogue for § 922(g)(1)'s criminalization of firearm possession by a person convicted of *any* felony or felony-equivalent offense." (Doc. No. 47 at 8 (emphasis added); *see also id.* at 9 ("[T]he government must identify founding-era laws that made it a crime for anyone convicted of an offense punishable by more than one year of imprisonment to possess a firearm.").) This is not the appropriate test for either his facial or as-applied challenge. A facial challenge, as Defendant appears to acknowledge elsewhere in his motion, requires the *party challenging the statute* to meet the "extremely high bar" of showing that "no set of circumstances exists under which the Act would be valid." *Ladson*, 2023 WL 6810095, at *2 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); (Doc. No. 47 at 2 ("[D]efendant respectfully submits that the Indictment against him must be dismissed as it is facially unconstitutional inasmuch as it could never be applied in a constitutional manner.")). And the appropriate analysis for Plaintiff's as-applied challenge is whether the Government can demonstrate a historical basis for the application of § 922(g)(1) to individuals like Canales, a former felon with three prior drug-trafficking convictions. *See id.* ("Where, as here, a defendant

raises an as-applied challenge to an indictment, the Court must determine whether a law with some permissible uses 'is nonetheless unconstitutional as applied' to the movants specific conduct."). That the Defendant is also making a facial challenge has no impact on this standard.

The Court also rejects Canales's argument that *Range* preempts the Government's attempts to bring forth historical evidence to support the constitutionality of § 922(g)(1). (Doc. No. 47 at 8 ("The government is entitled to the opportunity to identify such laws, however, it will be unable to do so, as foretold by the [*Range*] dissent.").) While it is true that in *Range* the Third Circuit held that the government failed to establish "a longstanding history and tradition of depriving people *like Range* of their firearms," Canales is demonstrably not "like Range." *Range*, 69 F.4th at 106 (emphasis added). The most significant distinguishing fact is that Canales's three prior drug-trafficking felonies place him in a group of individuals who have "demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). As numerous courts have recognized, guns and drugs are a "dangerous combination," and drug-traffickers are "dangerous and disruptive to society." *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *8 (M.D. Pa. Sept. 11, 2023) (quoting *Muscarello v. United States*, 524 U.S. 125, 132 (1998)); *Blackshear*, 2023 WL 5985284, at *3 (noting that "[d]rugs and guns are a 'dangerous combination'" and that Plaintiff's prior drug trafficking convictions suggested that he posed "a danger to society"); *United States v. Wise*, No. CR 21-511, 2023 WL 6260038, at *6 (W.D. Pa. Sept. 26, 2023) (noting that "the danger drug trafficking poses to society is only exacerbated when drug dealers possess firearms"); *United States v. Mosqueda*, No. CR 16-233, 2017 WL 5157847, at *4 (W.D. Pa. Nov. 7, 2017) ("The combination of drugs and guns constitutes a very serious danger to the community."). Thus, Canales's several prior

11

drug-related felonies, the most recent of which was in 2017, are a far cry from Range's singular, 28-year-old conviction for making a false statement on a food stamps application to help his struggling family. *Cf. United States v. Green*, No. CR 22-387, 2023 WL 6164407, at *2 (E.D. Pa. Sept. 21, 2023) ("Although Range pled guilty to a non-violent offense entirely unrelated to armament, [the defendant] has been convicted of drug trafficking and illegal gun possession, crimes that 'demonstrate that, if armed, he poses a danger to society.'"). The Government's failure to carry its burden with respect to non-violent individuals like Range suggests little about its ability to do so here where a dangerous felon is at issue. *See United States v. O'Connor*, No. CR 03-134, 2023 WL 5542087, at *3 (W.D. Pa. Aug. 29, 2023) (suggesting that in *Range*, the Third Circuit held that the government had failed to meet its burden "in light of [Range's] non-violent conviction"). Indeed, along with suggesting that their holding was "narrow," the court in *Range* specifically stated they were not deciding the issue of whether § 922(g)(1) is constitutional as applied to dangerous felons. *Range*, 69 F.4th at 104 n.9.

A review of the historical evidence put forth by the Government for disarming dangerous felons like Canales demonstrates that it has met its burden under *Bruen* and *Range*. Turning first to the pre-founding era, a timeframe the Supreme Court has found enlightening regarding the scope of the Second Amendment, the Government has put forth evidence that individuals who posed a potential danger to others were frequently disarmed. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."). Such restrictions date back to England, from whom we "inherited" our right to bear arms. *Heller*, 554 U.S. at 599. For example, a 17th century English statute allowed the government to "seize all arms in the custody

or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13.

Numerous colonies and states followed their English predecessors in disarming those who they deemed dangerous either because of their violent acts or their disloyalty. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others. Violence was one ground for fearing danger, as were disloyalty and rebellion."). *United States v. Jackson*, 69 F.4th 495, 502–04 (8th Cir. 2023) (collecting instances in which colonial American legislatures permitted the disarmament of individuals); *cf. Range*, 69 F.4th at 120–28 (Krause, J., dissenting) (providing a thorough examination of legislation and statutes that existed from the time of the English Restoration to the ratification of the U.S. Constitution that disarmed former felons). For example, a colonial New Hampshire statute permitted "affrayers, rioters, disturbers or breakers of the peace" to have their "arms or weapons" taken away. Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15; *see also* Act for the Punishment of Criminal Offenders, 1692-93, ch. 18, § 6 *reprinted in* 1 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (providing the same). Similarly, in March of 1776, the Continental Congress recommended that states disarm individuals who were "notoriously disaffected to the cause of America" or who "refuse[d] to associate, to defend, by arms the United American Colonies, against the hostile attempts of the British fleets and armies." 4 Journals of the Continental Congress 1774–1789, at 205 (1906). Massachusetts acted on this advice, shortly thereafter passing a law permitting the disarmament of individuals who refused to declare loyalty to the United States. Act of May 1, 1776, ch. 21, § 1, *reprinted in* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886). Numerous

other states, such as Pennsylvania, North Carolina, and Virginia, followed suit and passed similar laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States.  *See* Act of June 13, 1777, ch. 756, § 2–4, *reprinted in* 9 The Statutes at Large of Pennsylvania from 1682–1801 at 110–113 (William Stanley Ray ed., 1903); *Reichenbach*, 2023 WL 5916467, at *7 (citing 24 The State Records of North Carolina 89 (Walter Clark ed. 1905); 9 William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 282 (1821)).  And an early New Jersey statute allowed the government to disarm any individual that it judged "disaffected and dangerous to the present Government."  Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90.

  As the Government argues, precursors to the Second Amendment further support the assertion that the founding generation permitted the disarmament of dangerous individuals.  During the Pennsylvania ratifying convention, a "highly influential" minority proposal, *Heller*, 554 U.S. at 604, stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or *real danger of public injury from individuals*."  2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (quoting The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787) (emphasis added).  Similarly, a proposal at the Massachusetts constitutional ratifying convention provided that Congress may not "prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms."  *Id.* at 681 (emphasis added).

  This disarmament of individuals who were deemed dangerous continued post-ratification and through the Reconstruction era.[3]  For example, a federal Reconstruction order applicable to

---

[3] While the Court in *Bruen* emphasized that earlier historical evidence is particularly enlightening as to the scope of the Second Amendment, they also made clear that evidence from the Reconstruction era was relevant at the very least as "confirmation of what the Court thought had already been established" through older laws.  *Bruen*, 142 S. Ct. at 2137; *cf. Range*, 69 F.4th at 112 (Ambro, J., concurring) ("[T]he

South Carolina provided that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908–909 (1866). Further, as discussed in Judge Ambro's concurrence in *Range*, numerous states disarmed "tramps" whereas other states prohibited individuals who were "not engaged in any legitimate business" or had "ever borne arms against the government of the United States" from possessing a firearm. *Range*, 69 F.4th at 112 (quoting 2 General Statutes of the State of Kansas 353 (1897)).

Utilizing the "why" and "how" metrics set forth by the Supreme Court in *Bruen*, it is clear that these statutes present apt analogues to § 922(g)(1)'s restrictions on Canales's Second Amendment right.[4] Turning first to the "why" metric, while these various historical statutes have somewhat different language, targets, and impact, the common thread is that they were all efforts to disarm groups that "lawmakers deemed dangerous and disruptive to society" in an attempt to protect "the public from violence and disorder." *Reichenbach*, 2023 WL 5916467, at *7. Here too, given the connection between drugs, guns, and violence, "lawmakers have made a reasoned decision that drug traffickers are dangerous and disruptive to society." *Id.* Thus, disarming individuals like Canales, who have shown a proclivity toward drug trafficking, serves the same purpose of protecting the public from unnecessary violence. Similarly, the "how" metric suggests that these statutes are closely aligned: both these historical statutes and § 922(g)(1) reflect a decision from lawmakers that disarming dangerous individuals was an appropriate

---

Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights in 1791 or the Fourteenth Amendment in 1868.").

[4] Defendant argues that because § 922(g)(1) does not address "unprecedented" concerns, the Government is required to show a "distinctly similar" historical analogue as opposed to a "relevantly similar" analogue. (Doc. No. 47 at 9.) Defendant is correct that "[r]egulations targeting longstanding problems must be 'distinctly similar' to a historical analogue," *Range*, 69 F.4th at 103, whereas a modern regulation that was "unimaginable at the founding" need only be "relevantly similar." *Bruen*, 142 S. Ct. at 2132–33. However, neither test requires a "historical twin." *Jenkins*, 2023 WL 6534200, at *3. Because the Court finds that the Government has met its burden regardless of which standard is applied, it need not address which test is appropriate.

means to ensure public safety. Accordingly, § 922(g)(1), as applied to Canales, is sufficiently analogous to the historical practices of firearm regulation, and the Government has met its burden under *Range* and *Bruen*.

The caselaw that Defendant cites further supports the Court's conclusion. Defendant relies on language from then-Judge Barrett's dissent in *Kanter*, Judge Hardiman's concurrence in *Binderup*, and Judge Bibas's dissent in *Folajtar* to argue that "[f]ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." (Doc. No. 47 at 10 (quoting *Kanter*, 919 F.3d at 451).) But while they may have found insufficient historical evidence for disarming felons more generally, each of these opinions acknowledges that there is a historical basis for disarming *dangerous* individuals. *Kanter*, 919 F.3d at 464 ("History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons. But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous."); *Binderup v. Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring) ("The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms."); *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others.").

In sum, Canales asks this Court to read *Range* to permit even those individuals who have demonstrated a proclivity toward violence and drug trafficking an unwavering right to bear arms. This the Court cannot do. Instead, given the scads of historical examples of lawmakers disarming those who they believed posed a potential danger to society, "this Court heeds—as it must—the wisdom of our Nation's founding generation, which demonstrated through early

American legislation that the right to bear arms must by necessity yield to the need to safeguard the Country's citizens." *Reichenbach*, 2023 WL 5916467, at *10.

### B. Section 922(g)(1) is Constitutional on its Face.

Canales also argues that "[f]ollowing *Range*, § 922(g)(1) is facially unconstitutional." (Doc. No. 47 at 9.) As discussed above, the Court rejects Canales's assertion that to survive his facial challenge the Government must "establish a historical analogue for § 922(g)(1)'s criminalization of firearm possession by a person convicted of any felony or felony-equivalent offense." (Doc. No. 47 at 8.) Instead, to succeed on a facial challenge, *Canales* "must establish that no set of circumstances exists under which [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011); *see also Blackshear*, 2023 WL 5985284, at *3 (applying this principle in the context of a facial challenge to § 922(g)(1)). Under this exacting standard, Canales's argument fails for a panoply of reasons.

First, as set forth above, there is historical evidence from the founding-era and beyond that supports the disarming of dangerous individuals. *See supra* at 12–16. And since Canales cannot show that § 922(g)(1) is unconstitutional even as applied to him, he has failed to demonstrate that there are no circumstances in which the statute will be constitutional. This forecloses any facial challenge. *See Blackshear*, 2023 WL 5985284, at *3 (rejecting facial challenge to § 922(g)(1) where Defendant failed to show that the statute "is unconstitutional as applied to his case, let alone in all circumstances.").

Second, the Supreme Court has signaled that § 922(g)(1) remains constitutional after *Bruen*. In *Heller* and *McDonald*, the Supreme Court held that the "longstanding prohibitions on the possession of firearms by felons" is "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *McDonald*, 561 U.S. at 786. This language was not dicta, *United States v. Barton*, 633

17

F.3d 168, 171 (3d Cir. 2011), and nothing in the Court's most recent opinion in *Bruen* suggests that this holding from *Heller* and *McDonald* is no longer good law, *see United States v. Morales*, No. 3:22-CR-161, 2023 WL 6276672, at *3 (M.D. Pa. Sept. 26, 2023) ("*Bruen* did not invalidate, alter, or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations."). To the contrary, as indicated earlier, six of the Justices, through concurring and dissenting opinions, signaled their view that § 922(g)(1) is constitutional even after *Bruen*. *See supra* at 5. Thus, this Court, bound by the Supreme Court's statement in *Heller* and *McDonald*, finds that § 922(g)(1) is a facially constitutional restriction on an individual's Second Amendment right.

The Third Circuit's opinion in *Range* does not, and could not for that matter, mandate a different result. Instead, the Court takes the Third Circuit at its word that the opinion was "narrow" and only held § 922(g)(1) unconstitutional as applied to those "like Range." *Range*, 69 F.4th at 106. The Court agrees with Judge Ambro that *Range* did not "spell doom" for § 922(g)(1) more generally and that the statute remains "presumptively lawful." *Id.* at 109 (Ambro, J., concurring); *see also id.* at 110 (outlining that *Range* "speaks only to [Range's] situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like"); *Terry*, 2023 WL 6049551, at *5 ("Nothing in *Range* suggests that the Third Circuit meant to declare § 922(g)(1) unconstitutional in all circumstances. Quite the opposite."); *O'Connor*, 2023 WL 5542087, at *2 ("The decision in *Range* did not undermine the constitutionality of § 922(g)(1) in all situations.").

Third, while Canales points to a handful of out-of-circuit opinions striking down other subsections of § 922, (Doc. No. 47 at 11–12), he ignores the fact that nearly every opinion in this

18

Circuit addressing § 922(g)(1) after *Range* has held it constitutional both on its face and as applied.[5] While these opinions are not binding, this trend undermines any attempt by Canales to show that § 922(g)(1) is unconstitutional in every application.[6]

Grasping for straws, Defendant argues that the fact that the first *federal* law disarming felons did not appear until 1938 and that the current iteration of § 922(g)(1) was not passed until

---

[5] *See, e.g.*, *Blackshear*, 2023 WL 5985284 (Pappert, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with multiple felony drug and firearm convictions based on *Heller* and the history of disarming dangerous individuals); *United States v. Ames*, No. 23-178, 2023 WL 5538073 (E.D. Pa. Aug. 28, 2023) (Kenney, J.) (denying as-applied and facial challenges to section 922(g)(1) by defendant with felony robbery and firearm convictions based on *Heller*'s "presumptively lawful" holding and longstanding felon dispossession statutes); *United States v. Minter*, No. 22-155, 2023 WL 6051265 (M.D. Pa. Sept. 15, 2023) (Mariani, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on *Heller* and historical statutes disarming individuals "deemed dangerous, untrustworthy, or unlikely to abide by the law"); *Reichenbach*, 2023 WL 5916467 (Brann, C.J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on historical prohibitions which were sufficiently analogous to § 922(g)(1) prohibiting drug traffickers from possessing firearms); *Wise*, 2023 WL 6260038 (Hardy, J.) (denying as-applied and facial challenges to § 922(g)(1) based on historical analogues which "disarmed individuals who were deemed to be dangerous, untrustworthy, or a threat to the orderly functioning of society"); *United States v. Cotton*, No. CR 22-471, 2023 WL 6465836 (E.D. Pa. Oct. 4, 2023) (Pratter, J.) (denying as-applied challenge to § 922(g)(1) based on historical analogues disarming individuals who "posed a potential danger"); *Ladson*, 2023 WL 6810095 (Baylson, J.) (denying as-applied challenge to § 922(g)(1) based on government identifying "numerous historical analogues establishing that the Second Amendment permits the disarmament of those who, like Defendant, are 'dangerous to the Peace'"); *Green*, 2023 WL 6164407 (Diamond, J.) (rejecting facial and as-applied challenges to § 922(g)(1) based on *Heller* and historical analogues).

[6] The Court is also aware of the Honorable Jennifer P. Wilson's two recent opinions in *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) and *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023), which dismissed the indictments of two individuals, one with prior felony drug offenses and the other with 13 prior felony offenses, including multiple armed robberies and drug trafficking. Judge Wilson's opinions (which largely mirror each other) are based on the conclusion that the Government failed to meet its burden of demonstrating that prohibiting drug traffickers from possessing firearms is consistent with the Nation's historical tradition of firearm regulation. Here, by contrast, the historical record presented by the Government demonstrates that the Government has carried its burden. Accordingly, the Court, as others have before it, does not find these opinions persuasive. *See Reichenbach*, 2023 WL 5916467, at *10 n.93 (M.D. Pa. Sept. 11, 2023); *United States v. Pearson*, No. CR 22-271, 2023 WL 6216527, at *3 (E.D. Pa. Sept. 25, 2023) ("We are mindful of two recent decisions (now on appeal) finding section 922(g)(1) unconstitutional as applied to persons with earlier convictions for possessing narcotics with intent to distribute. We are not persuaded by the reasoning in those decisions given the presumptively lawful regulatory measures enacted by Congress in section 922(g)(1).").

1961 is "fatal to § 922(g)(1) under the strict historical approach *Bruen* demands." (Doc. No. 47 at 10–11.) But the analysis under *Bruen* is whether there exists a "historical *analogue*" for the modern firearm regulation, not whether the regulation itself dates back to the founding era. *Bruen*, 142 S. Ct. at 2133 (emphasis in original).

Because Canales has failed to show that § 922(g)(1) is unconstitutional in all circumstances, or even in his own case for that matter, the Court finds § 922(g)(1) constitutional on its face.[7]

\* \* \*

Since none of Canales's arguments have merit, the Court denies his motion to dismiss his indictment. An appropriate order will follow.

---

[7] The Government also argues that § 922(g)(1) is constitutional on its face because in the founding generation, many felonies were punishable by death, exposing individuals to "far more severe consequences than disarmament." (Doc. No. 48 at 23.) However, the Third Circuit explicitly rejected this argument in *Range*, finding the Government's invocation of historical statutes that subjected individuals to more severe punishments did not suggest that "the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range*, 69 F.4th at 105.